## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

VIELKA M. LIPPE and )
CHRISTOPHER LIPPE, individually, )
and as husband and wife, )
           )
          Plaintiffs, )
           )
v. )      Case No. CIV-15-331-D
           )
CHRISTOPHER HOWARD, an )
individual and in his official capacity )
as a Police Officer for the City of )
Oklahoma City; and )
THE CITY OF OKLAHOMA CITY, a )
municipal corporation, )
           )
          Defendants. )

## ORDER

Before the Court are Defendant City of Oklahoma City's Objections to Plaintiffs' Expert Witness Reports of John A. Cocklin and Jason Bass and Use of Said Experts [Doc. No. 96], and Defendant Christopher Howard's Motion to Exclude the Expert Report and Testimony of Plaintiffs' Expert John Cocklin and Brief in Support [Doc. No. 97]. Plaintiffs have responded [Doc. Nos. 102, 104], and Defendants have replied [Doc. Nos. 108, 111]. The matter is fully briefed and at issue.[1]

---

[1] Based on the evidence in the record before it, the Court finds a formal hearing is not necessary. A formal hearing is not required to adjudicate a *Daubert* motion, and the Court has considerable latitude in deciding whether to hold a formal hearing. *See United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999); *see also Ho v. Michelin N. Am., Inc.*, 520 Fed. Appx. 658, 664 (10th Cir. 2013) (unpublished) (court properly exercised its discretion in issuing *Daubert* ruling without formal hearing due to number of expert reports, deposition transcripts and other evidence that accompanied the parties' argument).

# BACKGROUND

Plaintiffs have filed suit under 42 U.S.C. § 1983 and state law for injuries allegedly suffered during an encounter with Defendant Christopher Howard ("Howard"), a police officer for the City of Oklahoma City (the "City"). Plaintiffs have sued the City and Howard. The First Amended Complaint asserts four claims against Howard individually: 1) a § 1983 claim for unlawful seizure and excessive use of force; 2) intentional infliction of emotional distress and outrageous conduct; 3) intentional violations of Plaintiffs' state constitutional rights; and 4) negligence. [Doc. No. 13]. It also asserts a failure to train or supervise claim and a negligence claim against the City. In support of these claims, Plaintiffs retained John Cocklin and Jason Bass as expert witnesses to testify about police policies, procedures, training and use of force.

## 1. John Cocklin

From 2002 until his retirement from government service in 2014, Mr. Cocklin was the chief investigator for the New Jersey Division of Alcoholic Beverage Control ("NJ ABC"), which investigates alleged violations of the New Jersey Alcoholic Beverage Control Act. *See* Cocklin's Résumé [Doc. No. 97-1 at 2]. As chief investigator, Mr. Cocklin supervised detectives and civilian investigators. Cocklin's Dep. [Doc. No. 97-2 at 22]. From 1980 until 2002, Mr. Cocklin was a detective with the Division of Criminal Justice for the New Jersey Attorney General's Office ("NJDCJ") where he served in different supervisory roles, including chief of detectives. Cocklin's Résumé [Doc. No. 97-1 at 3-4]. Admittedly, the only time Mr. Cocklin has served as a uniformed police officer

was between 1977 and 1979. *Id.* at 5; *see also* Cocklin's Dep. [Doc. No. 97-2 at 25]. However, as a NJDCJ detective for 22 years, he held statewide police and special deputy sheriff powers and authority. Cocklin's Dep. [Doc. No. 97-2 at 24].

Since 2014, Mr. Cocklin has worked as an expert witness, first on his own and more recently as a salaried employee with Robson Forensic. Cocklin's Résumé [Doc. No. 97-1 at 1]; *see also* Cocklin's Dep. [Doc. No. 97-2 at 3-10]. Mr. Cocklin has testified as an expert witness in only three cases, all of which were dram shop cases involving alleged violations of alcoholic beverage regulations. Cocklin's Dep. [Doc. No. 97-2 at 4-7, 15-16]. Mr. Cocklin has no prior experience serving as an expert witness in use of force cases. He has written no peer-reviewed literature that relates to use of force.[2]

Mr. Cocklin's expert report in this case was "peer reviewed" by two of his colleagues at Robson Forensic. Cocklin's Dep. [Doc. No. 97-2 at 10-14]. One peer reviewer specializes in toxicology while the other specializes in "police service" cases. *Id.* at 10-14.

Mr. Cocklin has served as a New Jersey Police Training Commission certified instructor for 25 years. Cocklin's Résumé [Doc. No. 97-1 at 4]. He has provided instruction in more than 50 basic police training courses, including firearms training. *Id.* He has additional certifications as a firearms instructor, rangemaster and sub-gun instructor. *Id.*

_____

[2] Mr. Cocklin has authored publications and materials used by the alcoholic beverage industry, including the *State of New Jersey Alcoholic Beverage Control Handbook for Retail Licensees*. Cocklin's Résumé [Doc. No. 97-1 at 2].

As chief investigator of the NJ ABC, Cocklin created, designed and implemented the NJ ABC's *Last Drink Initiative* and the first statewide investigation of alcoholic beverage substitution by bars and restaurants. *Id*. at 2. In addition, he was a member of the NJ ABC's executive staff and participated in the review, modification and enactment of administrative regulations for the alcoholic beverage industry. *Id.*

Cocklin was a commanding member of the New Jersey Attorney General's Police Shooting Response Team. *Id*. at 3. The team established statewide protocols for the investigation of police involved shootings and other uses of deadly force. *Id.* In his role as deputy chief of detectives, he also oversaw the NJDCJ's Internal Affairs Unit and the Prosecutor's Supervisory Bureau for four years. *Id.* This role required Cocklin to supervise and review all criminal and non-criminal professional misconduct, use of force and code of ethics violations involving NJDCJ personnel and all county prosecutor offices in New Jersey. *Id.*

Mr. Cocklin intends to offer the following opinions concerning Howard's actions on February 1, 2014:

1. Howard, while off duty, in plain clothes and without his police badge created a dangerous situation when he took police action against Mrs. Lippe. Howard should have known that no objectively reasonable person under the same circumstances as Mrs. Lippe would have known he was a police officer.

2. Howard illegally detained, constructively arrested and injured Mrs. Lippe and caused damage to her vehicle.

3. A similarly trained and objectively reasonable police officer under the same circumstances would have determined he lacked reasonable suspicion to detain or probable cause to arrest.

4.    Howard used prohibited police tactics when he placed himself in front of a motor vehicle in an attempt to detain Mrs. Lippe. Further, Howard used excessive and deadly force against Mrs. Lippe. Howard's actions violated the standard of care outlined in the OCPD policies and procedures and was contrary to Oklahoma law and national model policies for off duty police conduct.

Cocklin's Report [Doc. No. 97-3 at 19].

Howard's and the City's objections to Mr. Cocklin's testimony are based on the content of Mr. Cocklin's expert report and his deposition testimony. Howard and the City contend that Mr. Cocklin has offered opinions on matters that he is not qualified to address and that his opinions on police procedure and use of force are not reliable.

### 2.    Jason Bass

Mr. Bass worked for the Oklahoma County Sheriff's Office from August 2000 until his resignation[3] in April 2015. *See* Bass' Résumé [Doc. No. 96-6 at 1]; *see also* [Doc. No. 96-4]. Prior to his resignation, Mr. Bass had achieved the rank of Corporal and his Advanced Peace Officer certification. Bass' Résumé [Doc. No. 96-6 at 1]; Bass' Report [Doc. No. 96-2 at 1]. As a Corporal Detective, Bass supervised criminal investigations, trained subordinates in proper police procedure, and developed and implemented departmental policies and procedures. Bass' Résumé [Doc. No. 96-6 at 1].

Mr. Bass was also assigned to the Special Investigations Unit ("SIU") of the Oklahoma County Sheriff's Office as a supervisor detective. Bass' Report [Doc. No. 96-2 at 1]; Bass' Résumé [Doc. No. 96-6 at 2]. The SIU is responsible for investigating

---

[3] A News 9 article attached to the City's motion indicates that Mr. Bass resigned from the Oklahoma County Sheriff's Office in April 2015 after he was arrested for petit larceny. [Doc. No. 96-4].

administrative and criminal allegations that involve Sheriff's Office personnel. *Id*. This includes allegations of staff misconduct and assaults both on and off duty. *Id.* In addition, Mr. Bass assisted in the development of the Oklahoma County Sheriff's Office *Policy and Procedures Manual*. Bass' Report [Doc. No. 96-2 at 1].

Mr. Bass' résumé indicates he was the sole administrator for the Oklahoma County Detention Center's inmate phone recording system. Bass' Résumé [Doc. No. 96-6 at 2]. In this capacity, Bass was charged with investigating criminal cases involving inmates. *Id.* Additionally, it appears Mr. Bass worked as a paid consultant for Telmate, an inmate communications firm. *Id.* at 1. Mr. Bass trained law enforcement and jail staff across the country on the company's software. *Id.*

Mr. Bass' report indicates he has submitted expert reports in two state cases.[4] Bass' Report [Doc. No. 96-2 at 1]. Neither case appeared to involve the use of force by a police officer. One involved charges of robbery with a dangerous weapon, first-degree burglary and kidnapping. The other included charges for possession of child pornography and downloading obscene materials. Thus, it appears Mr. Bass has no prior experience serving as an expert witness in use of force cases. Moreover, he has written no peer-reviewed literature relating to the use of force.

Based on his review of Howard's and other OCPD officers' depositions in this case, Mr. Bass opines that the OCPD failed to effectively train its officers on its policies

---

[4] *State of Oklahoma v. Aaron Todd Craddock*, Grady County District Court Case No. CF-2014-327 and *State of Oklahoma v. Najee Jamall Cox*, Oklahoma County District Court Case No. CF-2014-5226. The Court takes judicial notice of the docket reports for both cases on the Oklahoma State Courts Network, http://www.oscn.net.

concerning use of force, use of deadly force and carrying of firearms off duty. Bass' Report [Doc. No. 96-2 at 7]. Mr. Bass further opines that the OCPD's failure to train caused Mrs. Lippe's injuries on February 1, 2014. *Id.*

The City's objections to Mr. Bass' testimony are based on Mr. Bass' expert report. The City contends that Mr. Bass has offered opinions on matters that he is not qualified to address and that his opinions on police procedure and use of force are not reliable.

## DISCUSSION

Courts have broad discretion in determining the admissibility of expert testimony. *Taylor v. Cooper Tire & Rubber Co.*, 130 F.3d 1395, 1397 (10th Cir. 1997). A district court also has broad discretion to decide "how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) (*citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The admissibility of expert testimony is governed by FED. R. EVID. 702 and the Supreme Court's opinions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire*. *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1215 n. 1 (10th Cir. 2011) ("If expert testimony is not reliable under *Daubert/Kumho*, it is not admissible under Rule 702").

Rule 702 imposes upon the trial judge an important "gate-keeping" function with regard to the admissibility of expert opinions. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  In considering whether an expert opinion is admissible, the Court performs a two-step analysis.  First, the Court determines whether the expert is qualified by knowledge, skill, experience, training or education to render the opinion.  If so qualified, the Court must then determine whether the expert's opinion is reliable under the principles set forth in *Daubert* and *Kumho Tire* and relevant, in that it will assist the trier of fact.  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006); *Ralston v. Smith & Nephew Richards*, *Inc.,* 275 F.3d 965, 969 (10th Cir. 2001); *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006).

The Supreme Court in *Daubert* listed four non-exhaustive factors that a trial court may consider in making its reliability assessment:  (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been subjected to peer review or publication; (3) whether the technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory has been generally accepted in the relevant scientific community.  *Kumho Tire*, 526 U.S. at 149-150; *103 Investors I, L.P.*, 470 F.3d at 990 (*citing Daubert*, 509 U.S. at 593-594).  "The *Daubert* factors are 'meant to be helpful, not definitive,' and not all of the factors will

be pertinent in every case." *United States v. Baines*, 573 F.3d 979, 992 (10th Cir. 2009). Thus, in non-scientific cases, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150. The inquiry is always, and of necessity, highly fact-specific, and no one factor is outcome determinative.[5] Finally, when the testimony of an expert is challenged, the proponent of the testimony bears the burden of establishing its admissibility. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)

## A.    Expert Qualification

In considering the issue of expert qualification, the Court is guided by *Ralston*, which turned entirely on the expert's qualifications. *Ralston*, 275 F.3d at 965. Ralston asserted that the warnings accompanying an implanted orthopedic nail were inadequate. The Tenth Circuit affirmed the trial court's exclusion of the testimony of the plaintiff's expert, who was a board certified orthopedic surgeon and an associate professor at the University of Kansas Medical School. *Id*. at 969. The plaintiff's expert admitted that she

---

[5] The Advisory Committee Notes to FED. R. EVID. 702 identify other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by a jury. These factors include: (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See* FED. R. EVID. 702, advisory committee's note to 2000 Amendments.

was not an expert on intramedullary nailing and that she knew little about the subject. *Id.* Moreover, the plaintiff's expert testified she had never drafted a warning for a surgical device. *Id.* The expert's general credentials, although impressive, were insufficient. "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* at 970. Her reliance "upon general orthopedic and surgical principles and concepts" was not sufficient. *Id.* at 969-970. Additionally, her proposed testimony about the adequacy of the warning was not within the "reasonable confines" of her expertise. *Id.* at 970. "[A]s long as an expert stays within the reasonable confines of his subject area," a lack of specialization does not affect the admissibility of the expert opinion, but only its weight. *Id.* (internal citations omitted).

*Ralston* demonstrates that a focused approach to determining an expert's qualifications is appropriate. The question before the trial court is "specific, not general." *Kumho*, 526 U.S. at 156. The trial court must decide "whether this particular expert ha[s] sufficient knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Id.* "[T]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1092-1093 (W. D. Okla. 2009) (*quoting Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). Simply put, "[t]he real question is, what is he an expert about?" *In re Williams Sec. Litigation*, 496 F. Supp. 2d 1195, 1232 (N.D. Okla. 2007) (*quoting Wheeling Pittsburg Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001)). Under controlling case law, including *Ralston*, the qualifications of a proposed expert must be

assessed only after the specific matters he proposes to address have been identified. *Graves*, 675 F. Supp. 2d at 1093; *In re Williams Sec. Litigation*, 496 F. Supp. 2d at 1232. "[T]he expert's qualifications must be both (i) adequate in a general, qualitative sense (i.e., 'knowledge, skill, experience, training or education' as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert." *Id*.

In evaluating Mr. Cocklin's and Mr. Bass' qualifications, the Court essentially must decide whether they have sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case. *Kumho*, 526 U.S. at 156. Howard and the City argue that neither expert is qualified to express their proffered opinions in this case. Upon examination of Mr. Cocklin's report, résumé and deposition testimony, the Court concludes that Mr. Cocklin's qualifications do not encompass use of force or police policies, procedures and training.

Although Mr. Cocklin is clearly qualified to testify about issues regarding alcoholic beverage regulations, it appears he lacks any specialized knowledge related to use of force or police practice and procedure. In *Milne*, the Tenth Circuit affirmed the trial court's exclusion of the testimony of the plaintiffs' expert, who had no experience in organizing, supervising or studying mountain bike races. *Milne v. USA Cycling Inc*., 575 F.3d 1120, 1133-1134 (10th Cir. 2009). Although the expert had experience organizing and supervising paved road bike races, the trial court concluded his experience was insufficient to qualify him to testify about mountain bike races. *Id.* at 1133. The facts in *Milne* were clear that the prevailing rules and practices of mountain bike races are different from those at traditional road races. *Id.* The plaintiffs' expert had not published any articles about

bicycle racing, let alone mountain bike racing. *Id.* He testified that as a police officer, he had investigated hundreds of vehicle-bicycle collisions, but there was no indication any of those took place on a dirt road or in the course of a race. *Id.*

Similarly in *Wilson v. Woods*, the Fifth Circuit upheld the trial court's refusal to qualify the plaintiff's expert as an accident reconstructionist. *Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999). To support her theory that the defendant had exceeded the posted speed limit when the accident occurred, the plaintiff offered testimony from a mechanical engineer whose consulting work previously concentrated on fire reconstruction. *Id*. at 937. The expert testified that he had recently shifted his professional focus to automobile accident reconstruction. *Id.* Although noting its familiarity with the expert, who had testified before the court on other occasions as an expert on the cause and origin of fires, the trial court concluded that this fact did not make him an expert in accident reconstruction. *Id*. at 938. From its review of the record, the Tenth Circuit affirmed that the individual's "expertise" in accident reconstruction "was no greater than that of any other individual with a general scientific background." *Id.* at 938. He had never taught accident reconstruction courses, experimented or conducted studies in the field, or published anything on the subject. *Id.*

Further, in *Berry*, the Sixth Circuit cautioned about expert testimony on "police policies and practices," noting that such term "is so broad as to be devoid of meaning." *Berry*, 25 F.3d at 1352. "It is like declaring an attorney an expert in the 'law.' A divorce lawyer is no more qualified to opine on patent law questions than anyone else, and it is a mistake for a trial judge to declare anyone to be generically an expert." *Id.* The Sixth

Circuit reversed and remanded the case, finding that the plaintiff's expert lacked the qualifications to testify as to whether the city's failure to properly discipline police officers was the proximate cause of the police officer's fatal shooting of the victim. *Id.* Based on the expert's credentials as set forth in the record, the Sixth Circuit concluded that the expert was no more qualified than any member of the jury to know what effect claimed disciplinary shortcomings would have on the future conduct of different police officers. *Id.*

Mr. Cocklin has testified as an expert witness in only three cases, all of which were dram shop cases involving alleged violations of alcoholic beverage regulations. Cocklin's Dep. [Doc. No. 97-2 at 4-7, 15-16]. Mr. Cocklin has no prior experience serving as an expert witness in use of force cases, and he has written no peer-reviewed literature that relates to use of force. His expert report in this case was purportedly "peer reviewed" by two of his colleagues at Robson Forensic. Cocklin's Dep. [Doc. No. 97-2 at 10-14]. One peer reviewer specializes in toxicology while the other specializes in "police service" cases. *Id.* at 10-14. However, the normal process of peer review for scholarly articles bears little resemblance to the "peer review" Mr. Cocklin's report underwent. In academic publishing, peer review involves an editor's submission of an article to experts in the particular field; these impartial reviewers carefully evaluate the quality of the article, and assess the validity of the research, methodology and procedures; if they find the article lacking in scholarly validity and rigor, they reject it. *See e.g.*, John Jay College of Criminal Justice Lloyd Sealy Library, <u>Evaluating Information Sources: What is a Peer-Reviewed Article?</u>, http://guides.lib.jjay.cuny.edu/c.php?g=288333&p=1922599 (last visited Feb. 14, 2018).

Likewise, the Court concludes that Mr. Bass lacks any specialized knowledge related to use of force or police practice and procedure. The Court makes this conclusion based on Mr. Bass' report and his résumé. Mr. Bass' résumé does not indicate that he was ever a patrol officer, and his primary focus while employed with the Oklahoma County Sheriff's Office was administering the jail's communication system. He has no prior experience serving as an expert witness in use of force cases, and he has written no peer-reviewed literature relating to the use of force. Having found the two experts unqualified to opine on use of force, their opinions proffered in this case are inadmissible. Nevertheless, the Court proceeds to address reliability.

## B.      Reliability of Opinions

In conducting its *Daubert* review, the Court must focus on "principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595. Despite this focus, "an expert's conclusions are not immune from scrutiny." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (*quoting General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The purpose of the *Daubert* analysis "is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Dodge*, 328 F.3d at 1222-1223 (*quoting Kumho Tire*, 526 U.S. at 152).

A witness may acquire expertise on a subject based on experience in that field. *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014). In *United States v.*

*Garza*, the Tenth Circuit held that "police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters." *Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009). However, witnesses "relying solely or primarily on experience … must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Medina-Copete*, 757 F.3d at 1104. Whether other courts have accepted the methodology is relevant in determining whether expert testimony is reliable. *Attorney Gen. of Okla. v. Tyson Foods, Inc*., 565 F.3d 769, 780 (10th Cir. 2009).

Claims alleging excessive force by a police officer are analyzed under the Fourth Amendment "objective reasonableness" test. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Tenth Circuit has consistently held that "the violation of police regulations is insufficient to ground a § 1983 action for excessive force." *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005); *Marquez v. City of Albuquerque*, 399 F.3d 1216 (10th Cir. 2005); *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001); *Romero v. Bd. of County Comm'rs of County of Lake, State of Colo*., 60 F.3d 702, 705 (10th Cir. 1995). "That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant." *Tanberg*, 401 F.3d at 1163-1164. If a defendant violates the standard operating procedure ("SOP") governing the use of force, that fact may be pertinent to the police department's future decision to promote, retain or discipline the officer; it is not, however, relevant to determining whether the seizure violated the reasonableness requirement of the

Fourth Amendment.  *Id.* at 1164.[6]

The Supreme Court has also commented on the use of SOPs in determining whether an officer's traffic stop was pretextual.  *Whren v. United States*, 517 U.S. 806, 815 (1996).  "[P]olice enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time.  We cannot accept that the search and seizure protections of the Fourth Amendment are so variable … and can be made to turn upon such trivialities."  *Id.* (internal citations omitted).

Mr. Cocklin intends to testify that Howard's actions violated OCPD policies and procedures, Oklahoma law and national model policies for off duty police conduct.  Cocklin's Report [Doc. No. 97-3 at 19].  He also proposes that Howard used excessive and deadly force against Mrs. Lippe on February 1, 2014.  *Id.*  The Court notes that Mr. Cocklin is not proposing to testify about matters growing naturally and directly out of his research, independent of this litigation.  This Court has cautioned against experts "serving as a mere mouthpiece for the expression of [one party's] version of events."  *United States v. Littlejohn*, 2009 WL 5065559, * 5 (W.D. Okla. 2009).  Further, Mr. Cocklin relied on a "research associate" employed by Robson Forensic, with "no idea" of her qualifications, to research off-duty police officer best practices.  Cocklin's Dep. [Doc. No. 97-2 at 44-45].  Mr. Cocklin included her research in his report.  *Id*. at 45.

More troubling, perhaps, is the fact that Mr. Cocklin in forming his opinion relied

---

[6] *See also Moreno v. Taos County Bd. of Comm'rs*, 587 Fed. Appx. 442, 446 (10th Cir. 2014) (unpublished).  The probative value of evidence of violation of SOPs or sheriff's office policies is outweighed by the danger that the jury will use a violation of the procedures or policies to find a constitutional violation.

on OCPD policies and procedures that were not in effect on February 1, 2014. Specifically, Mr. Cocklin cites in his report to the amended version of Policy 554.40 Use of Deadly Force, which highlights that officers may use deadly force toward an occupant of a moving vehicle only when (1) being fired upon or threatened to be fired upon or (2) the officer is actively pursuing the suspect and has exhausted all means to avoid being in the path of the moving vehicle. Cocklin's Report [Doc. No. 97-3 at 12-13]. This version did not become effective until October 13, 2015. *Compare* Ex. 5 to Def. City's Mot. for Summ. J. [Doc. No. 93-5] to Ex. 3 to Def. City's Objections to Pls.' Expert Witness Reports [Doc. No. 96-3]. Based on the amended version, Mr. Cocklin opined that Howard engaged in prohibited police tactics when he placed himself in front of Mrs. Lippe's motor vehicle. Cocklin's Report [Doc. No. 97-3 at 19].

Moreover, Mr. Cocklin's definition of excessive or deadly force does not appear to be consistent with current Tenth Circuit law. The Tenth Circuit has never held that pointing a firearm at a suspect, without more, constitutes excessive force. *Henry v. Storey*, 658 F.3d 1235, 1240 (10th Cir. 2011). The Tenth Circuit has consistently held that officers during a *Terry* stop may use "such steps [that are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007). Under certain circumstances, this includes drawing their weapons, placing a suspect in handcuffs or forcing a suspect to the ground. *Id. See also United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

Finally, Mr. Cocklin appears to credit Mrs. Lippe's testimony over the testimony of Howard. Specifically, Mr. Cocklin asserts that Howard struck Mrs. Lippe in the head with

his firearm. Cocklin's Dep. [Doc. No. 97-2 at 64-66]. This is a disputed fact. Howard's Dep. [Doc. No. 98-2 at 126]. Mr. Cocklin admittedly did not review any of Mrs. Lippe's medical records, but rather relied on Mrs. Lippe's characterization of her alleged injuries. Cocklin's Dep. [Doc. No. 97-2 at 41, 49-52]. The Tenth Circuit has noted that "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001). "[E]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." *Id. See also United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014) ("[T]he jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury.").

An expert's opinion must be based on facts that enable him to "express a reasonably accurate conclusion as opposed to conjecture or speculation." *Beck's Office Furniture and Supplies, Inc. v. Haworth, Inc.*, 1996 WL 466673, at *7 (10th Cir. Aug. 16, 1996) (unpublished).[7] The Tenth Circuit has consistently excluded expert testimony that was based on speculation. *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (proposed expert testimony must be supported by "appropriate validation – i.e., 'good grounds,' based on what is known."); *Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 366 (10th Cir. 1993) (striking professional speculation); *Eastridge Dev. Co. v. Halpert*

---

[7] Unpublished opinion cited pursuant to FED. R. APP. P. 32.1(a) and 10TH CIR. R. 32.1.

*Associates, Inc.*, 853 F.2d 772, 783 (10th Cir. 1988).

The Tenth Circuit has noted that the "touchstone" of admissibility under Rule 702 is helpfulness to the trier of fact. *See Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002); *Thompson v. State Farm Fire and Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994). In *Cook v. Peters*, the Northern District of Oklahoma granted the defendants' motion to preclude evidence regarding the violation of SOPs and sheriff's office policies. *Cook v. Peters*, 2015 WL 10986462, at * 2 (N.D. Okla. July 30, 2015). The court ruled that the probative value of the evidence was outweighed by the danger that the jury would use a violation of the SOPs or policies to find a constitutional violation. *Id. (citing Tanberg*, 401 F.3d at 1163-64 (a violation of a SOP was irrelevant to determining whether an arrest violated the reasonableness requirement of the Fourth Amendment)). Implicit in the court's analysis was the expectation that an expert will not adopt or espouse a definition of "objective reasonableness" that is inconsistent with controlling Supreme Court and Tenth Circuit law.

Presumably, some of the concerns regarding Mr. Cocklin's testimony might go to the weight of his testimony, and those concerns could be challenged adequately on cross-examination. The Court concludes, however, that the totality of those concerns tip the scale toward inadmissibility. As a whole, Mr. Cocklin's testimony is not based on "good grounds" or appropriately validated. *Mitchell,* 165 F.3d at 781. His testimony would not be helpful to the trier of fact, particularly when viewed in the context of current Tenth Circuit law regarding testimony on police practices in use of force cases.

Mr. Bass, in his report, attempts to summarize the deposition testimony of OCPD

Chief William Citty, Howard and four OCPD officers who responded to the 911 call made after the incident. Bass' Report [Doc. No. 96-2]. Mr. Bass does not provide citations to the deposition transcripts. Moreover, he appears to misrepresent the testimony. For instance, Mr. Bass stated, "Chief Citty stated himself that there is no training in place specifically for the responsibilities and requirements of an Oklahoma City Police Officer." Bass' Report [Doc. No. 96-2 at 2]. Rather, Chief Citty testified that OCPD officers today get "a lot more" training than he did 39 years ago. Citty's Dep. [Doc. No. 102-1 at 23]. He further testified that the training has "vastly" changed and officers today "get about twice as much training in the academy" than he did. *Id.* Unlike his training 39 years ago, today's officers are involved in much more structured field training under the supervision of multiple training officers. Citty's Dep. [Doc. No. 102-1 at 24-25].

Mr. Bass also indicated in his report that Chief Citty had testified he was the chief policymaker of the OCPD. Bass' Report [Doc. No. 96-2 at 3]. To the contrary, Chief Citty testified that the city council has "the final say on policy." Citty's Dep. [Doc. No. 96-9 at 28]. Mr. Bass further stated that Chief Citty testified that the OCPD does "not have in place a training log" where officers are made aware of new or revised policies. Bass' Report [Doc. No. 96-2 at 3]. Instead, Chief Citty testified that the OCPD sends a digital notice to officers when a policy or procedure is amended. Citty's Dep. [Doc. No. 96-9 at 46]. Officers must sign that they have read the policy. *Id.* Further, important policy revisions are discussed at in-service training. Citty's Dep. [Doc. No. 102-1 at 46-47]. Mr. Bass also offers opinions concerning training by the OCPD without reviewing any OCPD training material. Bass' Report [Doc. No. 96-2 at 2-4].

Like Mr. Cocklin, Mr. Bass in forming his opinion relied on OCPD policies and procedures that were not in effect on February 1, 2014. Mr. Bass opined that Howard "was not trained effectively when he stepped in front of a vehicle and pointed his firearm at the driver he suspected of committing a misdemeanor." Bass' Report [Doc. No. 96-2 at 7]. Mr. Bass cites to the OCPD Policy 554.40 Use of Deadly Force that became effective on October 13, 2015, which prohibits an officer from placing himself in the path of a moving or stationary suspect vehicle except under limited circumstances. *Compare* Ex. 5 to Def. City's Mot. for Summ. J. [Doc. No. 93-5] to Ex. 3 to Def. City's Objections to Pls.' Expert Witness Reports [Doc. No. 96-3]. He too appears to credit Mrs. Lippe's testimony over the testimony of Howard.

Mr. Bass further opined that the deposed officers gave "different definitions and examples of OCPD [p]olicy and [p]rocedures" and that the different interpretations were a result of ineffective training by the OCPD. Bass' Report [Doc. No. 96-2 at 7]. Mr. Bass does not advise how the officers' interpretations differ nor does he explain how the training is inadequate. There are limited circumstances under which a "failure to train" claim can be the basis for liability under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id*. at 388. In other words, the question becomes is the training program adequate? If it is not adequate, is the inadequate training representative of "city policy." *Id.* at 390.

The focus must be on the adequacy of the training program in relation to the tasks

the particular officers must perform. *Id.* "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-391. Finally, the identified deficiency must be "closely related to the ultimate injury." *Id*. at 391. *See also Carr v. Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003) (Carr and his experts relied on the absence of specific training; court found that those assertions merely demonstrated the knowledge of hindsight). Mr. Bass' opinion appears to lack this essential analysis. Given the problem areas identified *supra*, the Court concludes that Mr. Bass' testimony, like Mr. Cocklin's, would not be helpful to the trier of fact and should be excluded.

### C.     Expert Testimony Presenting Legal Conclusions

The City argues that Mr. Cocklin's report indicates that he intends to opine on the use of force in a manner that constitutes a legal conclusion. Plaintiffs contend that Mr. Cocklin's opinions fall within the accepted standards of the field under *Zuchel*, 997 F.2d at 742.

The Tenth Circuit has recognized such limitations on expert witness testimony. "In no instance can a witness be permitted to define the law of the case." *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988). Expert testimony "crosses the line between the permissible and impermissible when it 'attempt[s] to define the legal parameters within which the jury must exercise its fact-finding function.'" *Smith v. Ingersoll-Rand Co*., 214 F.3d 1235, 1246 (10th Cir. 2000).

On Page 17 of his report, Mr. Cocklin opines that Howard did not have reasonable

suspicion to detain Mrs. Lippe and that "his use of deadly force" violated Mrs. Lippe's Fourth Amendment right against unreasonable seizure. Cocklin's Report [Doc. No. 97-3 at 17]. Further, on Page 19, Mr. Cocklin opines that Howard used "excessive force and deadly force" against Mrs. Lippe. Cocklin's Report [Doc. No. 97-3 at 19]. The Court agrees with the City that these opinions constitute legal conclusions and invade the jury's role in the determination of the issues to be decided. Mr. Cocklin cannot offer an opinion that Howard's conduct was constitutionally improper, nor can he offer testimony that would in effect instruct the jury on the law regarding the use of force. *See United States v. Littlejohn*, 2009 WL 5065559, at *3 (W.D. Okla. Dec. 15, 2009); *see also Carr v. Castle*, Western District of Oklahoma Case No. CIV-01-124-C Jury Instruction No. 6 [Doc. No. 305 at 10-11] ("Whether or not the force used by the defendant officers was reasonable is an issue to be determined by you in light of all the surrounding circumstances.").

## CONCLUSION

For the reasons stated, the City's Objections to Plaintiffs' Expert Witness Reports of John A. Cocklin and Jason Bass and Use of Said Experts [Doc. No. 96], and Howard's Motion to Exclude the Expert Report and Testimony of Plaintiffs' Expert John Cocklin and Brief in Support [Doc. No. 97], are GRANTED.

IT IS SO ORDERED this 14th day of February 2018.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE